**Affirm and Opinion Filed September 29, 2023**



**In The**
**Court of Appeals**
**Fifth District of Texas at Dallas**

**No. 05-21-00918-CV**

**IN THE INTEREST OF S.I.J., S.M.J., S.D.J. II, CHILDREN**

**On Appeal from the 255th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DF-20-07514**

## MEMORANDUM OPINION

Before Justices Molberg, Pedersen, III, and Miskel
Opinion by Justice Molberg

Pro se Father appeals the trial court's final decree of divorce making Mother

sole managing conservator of children S.I.J., S.M.J., and S.D.J.  Because we find

Father's complaints meritless, we affirm in this memorandum opinion.

### Background

We will discuss the proceedings in the trial court and the evidence presented

at trial to the extent necessary to resolve Father's appellate issues.  Father filed an

original petition for divorce from Mother on May 21, 2020.  The couple had three

boys, S.D.J., S.M.J., and S.I.J., aged eight, four, and three respectively.  In her

counterpetition, Mother alleged, among other things, that S.M.J. and S.I.J. had

mental or physical disabilities and required substantial care and personal supervision.

On October 20, 2020, the trial court entered temporary orders under which Father and Mother were temporary joint managing conservators. Among other things, Father and Mother were prohibited from consuming alcohol or a controlled substance within eight hours before or during the period of possession of or access to the children.

On February 22, 2021, the trial court conducted a bench trial over Zoom. During Father's testimony, his counsel repeatedly asked him to answer the questions being asked and to refrain from speaking unless he was answering questions. After a short break, counsel for Mother stated, "Judge, before we continue, my client has some very strong concerns that Mr. Jackson might be intoxicated right now. And before we continue, I just want to go on the record and make sure that -- that he does have the capacity to continue to answer questions and participate in this hearing?" Counsel for Father responded:

> Judge, first I'd like to say "thank you" to the Court and Mr. Aldinger for allowing us a quick break there. Mr. Jackson, I think, is under a lot of stress, complicated by the situation with his family and his young boys, the divorce trial. I asked him if he's under any type of substance medication, any prescriptions, any substance at all that would inhibit his ability to testify? And he said, no, Judge. So I just -- Mr. Jackson is more of a situation of stress and pressure of the situation.

Father then told the court he could proceed with the trial. When his testimony resumed, it was interrupted again when it appeared Father was speaking with

someone in his room; he told the court, "I'm sorry, Judge. That was somewhere else, but done and done. Umm, yeah. I had to take care of -- someone wanted to sneak in the phone. Yeah, we can't do that. Not even." The court inquired of Father's counsel: "Are you sure, Mr. Kelly, that your client is okay to testify because his demeanor is quite bizarre?" Mother's counsel stated:

> Judge, under the circumstances, I'd rather us get him on the record. But if Mr. Kelly asks for additional courtesy, then that's fine. I'll grant him that. I just want to get to the bottom of this because, again, my client has very strong concerns that he is intoxicated either with alcohol or some drug into his system. And she has very real concerns about it. And if not, with the capacity to participate today, I think we need to reset this, out of fairness of the parties and Mr. Kelly, as well. With that on the record, if he needs five minutes to confer with his client, again, I'll leave it up to the judge's discretion. I'm not gonna be opposed.

After a five-minute break, Father's counsel stated:

> I did speak with my client. I believe that my client is not under any illegal or substances -- illegal substance and/or alcohol today that would impair him. As fair [sic] as clear impairment, I believe is lack of sleep, stress. Maybe that combination. He said he's been taking some Tylenol. I'm not sure if it's an adverse reaction to the non-prescription pain relief. Something has caused this gentleman not to be himself today. It's somewhat obvious. His demeanor is not -- I don't want to say "acceptable." It wasn't normal today. We're asking for a brief recess to allow Mr. Jackson to take care of whatever conditions that's caused him to not be able to testify here today and have a quick reset?

Counsel for Mother reiterated Mother's belief that Father was intoxicated due to "either alcohol or the addition of some type of drug added to the alcohol," and she "ask[ed] the court to go ahead and order [Father] to appear this morning for a drug and alcohol test on hair and urine." Among other things, counsel for Father

responded, "if they want to do a drug test for illegal substances, that would be fine," and that a urine test would be fine.

The trial court allowed Mother to make a trial amendment to plead that she now sought to be sole managing conservator, and the court required Father submit to drug testing that morning. The court also indicated it would restrict Father's possession and access until trial concluded.

On February 26, 2021, Mother filed her first amended counterpetition for divorce. Among other things, the counterpetition stated that Father "may pose, or poses, a significant risk of harm to the physical safety and emotional well-being and development of the children the subject of this suit[,]" and requested Mother be appointed sole managing conservator of the children. Mother requested, among other things, that Father be required to complete a substance abuse evaluation and complete any plan recommended by the evaluator; obtain an alcohol monitoring device or be subject to random drug and alcohol testing; be supervised during any periods of visitation until he completed a treatment plan recommended following substance abuse evaluation; and "complete all education and training related to the care of [S.M.J.] and [S.I.J.]."

Father's hair and urine drug test results from the first day of trial were filed in the record on March 9, 2021. They reflected positive results for ethyl glucuronide (ETG) and ethyl sulfate (ETS).

Trial continued on April 5, 2021. Mother called Chris Deal to testify. Deal performed alcohol and drug testing on Father following the first day of trial. He stated Father's urinalysis test was positive for ETG, at a level of greater than 80,000 ng/ml, and for ETS, greater than 20,000 ng/ml. Deal said the hair test could reflect alcohol consumption over the past 90 days, and the urine test could reflect consumption over the past 80 hours.

Father testified his gross income was $39,000 annually. He said S.D.J. was ten, S.M.J. was four, and S.I.J. was three. When counsel asked him whether one of the children was "closer to six," Father answered, "no." Father stated S.M.J. and S.I.J. had been diagnosed with neuronal ceroid lipidosis, which he described as a degenerative brain disease that, in practical terms, meant the two children could not walk or speak. S.M.J. required a feeding tube "a lot of the time," and neither child could lift his arms. Both children required wheelchairs to be moved. S.M.J. and S.I.J. had four nurses, paid for by Medicaid, who, over a twelve-hour period each day, gave the children basic care, muscle movement care, and helped them learn as much as they could.

Father said he did not receive communication from Mother about the two boys. He also tried to receive information from the boys' doctors but "met resistance there" as well. Father said Mother left the marital residence in August 2019. Before then, Father said he slept with the boys so he could monitor their seizures, changed diapers, cooked, cleaned, and other "normal stuff." After the COVID-19 pandemic

–5–

began, Father said he no longer took them to the doctor as much because doctors' offices allowed just one parent during visits. Father wanted the court to allow him access to the children's medical records and to require Mother to inform him about any new changes if Father did not learn about them from the doctor. He also wanted to be informed about doctor's appointments and medications the children were taking. Father said that sometimes the nurses were sent home when it was Father's turn to take the children, despite the fact that the nurses still had time scheduled with the children. Father wanted the court to require access to the nurses like Mother had.

Father said he had a good relationship with S.D.J. Father coached S.D.J.'s baseball and soccer teams, taught him how to cook, and played video games with him.

Father also discussed what happened the morning of the first day of trial. He said he was tired and stressed and "had a few drinks to help [him] sleep," but that since then, he had "been doing what's necessary to handle all those issues." He had been seeing a specialist to help him deal with the stress, alienation, and feelings of anxiety. He also participated in the BACtrack program[1] following the incident, said he had stopped consuming alcohol, and was willing to continue being monitored by BACtrack.

---

[1] BACtrack is service in which the participant utilizes a breathalyzer device to measure his blood alcohol content level.

Father testified he owned the marital home, and he wanted to keep living there. He wanted to buy Mother out of the equity of the home, which, he said, was worth around $196,000. The other major assets included the cars and Mother's retirement account. Father was seeking half of the funds in Mother's retirement account, and he believed they should keep their own vehicles.

On cross-examination, Father denied he was an alcoholic and denied having any problems with alcohol—he said he could stop anytime he liked. But he said he would not agree to a permanent alcohol injunction "because that means never." Father admitted he had been arrested for DWI twice. On April 14, 2019, he was arrested for DWI and unlawful carrying of a weapon. He invoked his Fifth Amendment rights when questioned about whether he had consumed alcohol or possessed a weapon on that date. Father said he was also arrested for DWI on August 24, 2019. When asked whether he would agree to continue BACtrack testing for one year, he said he would agree to it for thirty days but he did not agree that Mother should have access to the BACtrack testing results.

Father stated he was ordered to complete education and training regarding the care of his sons, and he said he had not done the training because, he said, "it doesn't exist."

Mother testified about an incident of family violence in December 2019. She said she took the children over to Father's house; he expressed his frustration that she was "not doing [her] part to mend some things in the relationship," and she went

into the garage to "allow things to kind of cool off." Father told her she needed to take the children and leave, and after she put the children in the car, she saw that Father was drinking wine. Father noticed that Mother saw what he had been drinking and stated, "Yes, I have been drinking." She said he took the bottle and "shoved it into [her] face very hard." Mother testified this hurt, and when she picked up her phone to record the incident, Father grabbed her phone and she was unable to get it back. He took it and threw it into a neighboring yard. Mother said she filed a report with the police about the incident.

Father, on redirect examination, denied Mother's version of the event happened. He said Mother "two-hand shoved" him and was taunting him to fight her, so he took her phone and threw it over the fence to get her to leave.

Mother also said prior to this incident there had been incidents of family violence during the marriage. She said in July 2018, on an occasion when Father had been drinking, following an argument, Father choked her and then "tried to toss [her] and slam [her] in the garage on the floor." She said Father could not slam her because she had tightly wrapped her legs around him. When they were back inside, Father slammed Mother down onto the floor, and her head missed the stone fireplace by a couple of inches. Mother left the house so the situation could cool off.

Father denied this assault ever took place. He stated he never struck Mother that day.

Mother also discussed an incident that occurred in the summer of 2016 when Mother told Father he could not drive their vehicle to his brother's house because, she said, Father was drunk. Father took the car keys anyway and got in the vehicle while Mother, who was holding S.M.J. and pregnant with S.I.J., stood behind the vehicle, telling Father not to move it. As Father turned on the vehicle, Mother opened the trunk, and Father backed into her causing her to "fl[y] into the back of the trunk" as the top of the vehicle hit the garage. Father screamed at Mother that she had "broken the car" and he exited and slammed Mother onto the ground while she was still holding S.M.J. Mother said at one point she was able to put S.M.J. in his car seat, get in the vehicle herself, and lock it. She stated Father, who was "foaming at the mouth," returned with a pocketknife and slammed the car window. This went on for about ten minutes before Father went inside again. Mother heard things breaking inside the house before there was a sustained calm, at which point she took her son and went inside and found Father "passed out on the couch."

Father denied this event as told by Mother happened. He said he was trying to back out of the garage, and he was not drunk. Mother ran behind the vehicle, and he got frustrated with her because she was pregnant and holding S.M.J. Father said he did not push Mother, and she did not fall.

Mother said Father had a history of alcohol abuse during the marriage. She said he did not have control when it came to alcohol. She said he had been arrested for driving while intoxicated twice. The first arrest was on April 14, 2019. She

–9–

became aware of the arrest because she had to take his blood pressure medication to him at the DeSoto jail. Mother said they later discussed the incident and she said he felt he drank enough on the occasion to be stopped by police. Mother was concerned about Father possessing a handgun while drinking because he could "los[e] control." She became aware of Father's second DWI arrest when she had to remove their vehicle from the impound. Father later told her he had fallen asleep at a stop sign and was detained by the police as a result; he admitted to her he had been drinking earlier in the day.

Mother said she did not think Father had ever engaged in any kind of in- or outpatient alcohol treatment, and she believed he would benefit from such treatment.

Mother said she had difficulty during the marriage getting ahold of Father to discuss caring for the children. Father would not respond to text messages or answer phone calls. She said Father had his own online portal where he could access the children's health information.

Mother wanted sole managing conservatorship because she believed it was in the best interest of the children for someone to be able to make decisions "right then and there, without having to wait a week or two weeks to hear from" Father. Further, she said, the "alcohol usage [was] extremely concerning" to her, particularly given that S.M.J. and S.I.J. had seizures throughout the day. She questioned whether someone who was drunk or hung over could know whether something was going on

with either of the boys. Mother was also concerned about Father's anger management problems which he had never acknowledged.

Mother wanted Father to have access to the children but "with some accountability," so she wanted Father to have a "step program," where step one was supervised visits for ninety days. Mother did not think ninety days of alcohol testing was adequate because she did not believe Father could resolve his problem in ninety days. She also did not believe Father's mother would be an appropriate supervisor because she did not think his mother could hold him accountable. Mother wanted real-time access to testing results from BACtrack so she could ensure the children's safety was the top priority. Mother said the next step would be restricted access where he does not have overnight stays for a period, to periods including overnight access, at least for S.D.J. Then, if he completed a period of clean tests, he could move onto "something else." Mother believed it was in the children's best interest that BACtrack testing continue through all of these periods of possession for accountability.

On April 5, 2021, the trial court issued a memorandum ruling that stated, among other things:

> The Court finds that during the Initial Zoom Trial on February 22, 2021, the Court found that [Father] had extremely bizarre behavior during the trial, and the Court had a suspicion that he was under the influence of alcohol or drugs. The Court finds that it had to take a number of breaks so that Attorney Patrick Kelly could try to regroup his client . . . . The Court finally stopped the Trial and Ordered that [Father] go to Nation Drug screening in order to submit a hair and urine sample. The Court

–11–

finds that the drug and alcohol results that returned on March 9, 2021 were extremely high for ethyl glucuronide. The Court finds that [Father] was intoxicated and under the influence of alcohol during the February 22, 2021 Trial. The Court finds that [Father] currently has two DWIs currently pending in Dallas County. The Court finds that [Father] believes he does not have a problem with alcohol. The Court finds that [Father] states that he goes to a Dr. Stephenson weekly for alcoholism. The Court finds that since the February 22, 2021 Trial, [Father] has been using a [BACtrack] Alcohol Monitoring Device. The Court finds that [Father] states that he should not be prohibited from ever drinking alcohol.

The trial court entered a final decree of divorce on September 22, 2021. As pertinent here, the court appointed Mother sole managing conservator and Father possessory conservator. Father's possession of S.I.J. and S.M.J. was limited to two hours every other Saturday, supervised at Faith and Liberty Place. Father was ordered to admit himself to an inpatient alcohol treatment program and complete the program before he could have any unsupervised access to the children. Father was ordered to obtain and use the services of BACtrack to be tested daily for alcohol use, which he could discontinue after receiving twelve months of no positive test results. Father was ordered to "complete all training involving the care of the children on or before August 31, 2021." The trial court enjoined Father and Mother from consuming alcohol or any controlled substance for which they did not have prescriptions.

Father's counsel withdrew on October 19, 2021, and Father proceeds pro se in this appeal.

**Discussion**

–12–

In his second issue, Father argues the trial court lacked subject matter jurisdiction. He raises multiple points, contending Mother's counter petition and amended counter petition did not allege domestic violence in the marriage, there was no evidence to support Mother's requests, and the trial court erred by ordering Father "to follow medical instruction based on a medical diagnosis that had not been determined by medical experts." Father asks this Court to vacate all orders in the final decree of divorce "due to the court's lack of subject matter jurisdiction" relating to inpatient treatment, BAC monitoring, hair and urine testing, and seeing Dr. Stephenson for alcohol dependence treatment.

We reject Father's argument that the trial court lacked subject matter jurisdiction over this divorce proceeding. Trial courts have the power to and broad discretion in determining the custody of children "as an incident to the granting of a divorce." *See Page v. Sherrill*, 415 S.W.2d 642, 645 (Tex. 1967). The Texarkana Court of Appeals recently articulated a trial court's power to condition a parent's possession or access:

> When a trial court appoints a parent possessory conservator, it can conclude that unrestricted possession would endanger the physical or emotional welfare of the child, but that restricted possession or access would not. A court can fashion a possession order that remedies the danger to the child's welfare by placing restrictions and conditions on possession or access. Indeed, if the trial court appoints a possessory conservator, it may grant, deny, restrict, or limit the possessory conservator's possession of or access to the child.

–13–

*In re Marriage of Patel & Parrish*, 643 S.W.3d 216, 223 (Tex. App.—Texarkana 2022, no pet.) (internal citations and quotations omitted). The trial court has discretion to impose restrictions or limitations on a parent's right to possession of or access to a child as long as they do not exceed those required to protect the best interest of the child. *Gerges v. Gerges*, 601 S.W.3d 46, 64 (Tex. App.—El Paso 2020, no pet.). Accordingly, we conclude the trial court had jurisdiction to make the orders it did here relating to Father's possession of or access to the children.

We also must reject Father's complaint about Mother's pleadings. As we stated recently:

> Our procedural rules require pleadings to provide fair notice of the claim and the relief sought such that the opposing party can prepare a defense. A petition is sufficient if it gives fair and adequate notice of the facts upon which the pleader bases her claim. Under this standard, courts assess whether an opposing party can ascertain from the pleading the nature of the controversy, its basic issues, and the type of evidence that might be relevant.

*J.G. v. Jones*, 660 S.W.3d 786, 789 (Tex. App.—Dallas 2023, pet. denied) (internal citations omitted). In her original counterpetition, Mother sought for herself and Father to be appointed joint managing conservators. As noted above, after Father's above-described conduct on the first day of trial, the court granted Mother's request to amend her counterpetition to seek appointment as sole managing conservator and supervised access for Father. *See* TEX. R. CIV. P. 66; *Hampden Corp. v. Remark, Inc.*, 331 S.W.3d 489, 497–98 (Tex. App.—Dallas 2010, pet. denied) ("[U]nder rule of civil procedure 66, a trial court is required to freely grant a request to amend

–14–

pleadings during trial unless the opposing party presents evidence the amendment would prejudice that party in maintaining an action or defense on the merits."). Father made no objection to Mother's proposed trial amendment. Mother did so amend her pleading and stated in her amended counterpetition that Father "may pose, or poses, a significant risk of harm to the physical safety and emotional well-being and development of the children the subject of this suit." Applying our fair notice pleading standard, we conclude Mother, when she amended her counterpetition, sufficiently raised the issue of Father's alleged alcohol abuse, its impact upon the physical safety of the children, and related issues, including the issue of domestic violence. Accordingly, we reject Father's contention and overrule his second issue.

In his third issue, Father argues the trial court ordered him to complete "doctor required training without evidence of courses, certificates, or training specifications." He further argues no evidence warranted the restriction of his possession and access to his children, and there were "no reports against [him] of neglect, abuse, endangerment, or any other behavior to support court ordered supervised visitation." Relatedly, in his eighth issue, Father argues the trial court erred when it found Father committed acts of family violence because no credible evidence supported the allegations. And in his fourth issue, Father argues the trial court's order that he admit himself to an inpatient alcohol treatment program and successfully complete the program before he had any unsupervised access to the

–15–

children was not supported by the evidence. Father requests the final decree of divorce be modified to incorporate the possession and access schedule previously established in the temporary orders.

We review the trial court's decisions on custody, control, possession, and visitation matters for an abuse of discretion. *Newell v. Newell*, 349 S.W.3d 717, 720 (Tex. App.—Fort Worth 2011, no pet.). In our review of a child custody ruling, "legal and factual sufficiency are not independent grounds of error but are relevant factors in deciding whether the trial court abused its discretion." *Id.*; *In re M.P.B.*, 257 S.W.3d 804, 811 (Tex. App.—Dallas 2008, no pet.). In determining whether the trial court abused its discretion, we consider whether (1) the court had sufficient information upon which to exercise its discretion and whether (2) it erred in its application of that discretion. *Newell*, 349 S.W.3d at 720–21. Regarding the first question, the traditional sufficiency review comes into play; with regard to the second, "we determine, based on the elicited evidence, whether the trial court made a reasonable decision." *In re M.M.M.*, 307 S.W.3d 846, 849 (Tex. App.—Fort Worth 2010, no pet.). An abuse of discretion does not occur if some evidence of a substantive and probative character exists to support the trial court's decision. *In re B.J.W.S.*, No. 14-08-01154-CV, 2010 WL 4396291, at *6 (Tex. App.—Houston [14th Dist.] Nov. 4, 2010, no pet.) (mem. op.). When an order, as here, affects the conservatorship and possession of a child, the child's best interests are the primary consideration. *In re K.J.B.*, No. 07-21-00235-CV, 2022 WL 2173203, at *1 (Tex.

–16–

App.—Amarillo June 16, 2022, no pet.) (mem. op.) (citing TEX. FAM. CODE § 153.002).

The record before us contains evidence showing that S.M.J. and S.I.J. had complex medical needs requiring specialized, around-the-clock care, and that Father had not completed training the court previously ordered regarding the care of the children. Accordingly, we conclude the trial court did not abuse its discretion in ordering Father to complete training regarding the care of the children. Further, evidence reflects Father had a significant problem with alcohol abuse and had committed acts of domestic violence. Evidence showed Father had committed three acts of family violence against Mother, all of which involved Father consuming alcohol, and one of which involved and directly endangered S.M.J. Evidence showed Father had been arrested for DWI twice and had to delay trial in this case due to alcohol consumption. More broadly, Mother testified Father had a history of alcohol abuse during their marriage and that he did not "have control" when drinking. Yet Father denied he had a problem with alcohol, testifying he had no problems with alcohol. Given this, we conclude the trial court did not abuse its discretion in ordering Father to undergo training regarding the medical care of the children, finding Father committed acts of family violence, requiring inpatient alcohol treatment, or requiring supervision for his periods of access to the children. Further, in light of all of the above, we conclude the trial court did not abuse its discretion in restricting Father's possession of and access to the children.

–17–

In his ninth issue, Father argues the trial court erred by awarding attorney's fees to Mother because no evidence supported such an award. Section 6.708 of the family code provides that, "[i]n a suit for dissolution of a marriage, the court may award reasonable attorney's fees and expenses." TEX. FAM. CODE § 6.708(c). To support a request for such an award,

> testimony should be given regarding the hours spent on the case, the nature of preparation, complexity of the case, experience of the attorney, and the prevailing hourly rates. The trial court does not need to hear evidence on each factor but can look at the entire record, the evidence presented on reasonableness, the amount in controversy, the common knowledge of the participants as lawyers and judges, and the relative success of the parties.

*In re Marriage of C.A.S. & D.P.S.*, 405 S.W.3d 373, 387 (Tex. App.—Dallas 2013, no pet.) (cleaned up). The trial court has broad discretion in awarding an amount of attorney's fees. *Id.* at 386.

In her answer and in her counterpetition for divorce, Mother requested attorney's fees to "effect an equitable division of the estate of the parties and as a part of the division, and for services rendered in connection with conservatorship and support of the children[.]" Mother's counsel testified at trial, the trial court admitted his billing statement into evidence, and Father stipulated to Mother's counsel's qualifications. Counsel stated his hourly rate was $350/hour and his assistant's rate was $150; opposing counsel stipulated these were reasonable rates. Mother's counsel stated the fee total was $11,629.34 through the end of January. He stated these fees were reasonable and necessary. He also sought $2,450 in additional

fees for time spent in trial. In questioning whether attorney's fees were warranted here, Father's counsel cross-examined Mother's counsel about whether this was a standard divorce case, and Mother's counsel stated they had to file numerous pleadings, Father's alcohol use posed a safety issue for the children, and there "were very serious allegations in this case." We conclude Mother's counsel's testimony provided a reasonable basis for the award of attorney's fees, and we conclude the trial court did not abuse its discretion by awarding $7,500 in fees. *See In re Marriage of C.A.S. & D.P.S.*, 405 S.W.3d at 386–87.

In his fifth issue, Father complains about various orders and filings, arguing they are "misleading, misidentified, or missing." He complains that a February 24, 2021 order suspending his possession and access to the children is mislabeled as "non-signed"; Mother's May 6, 2021 motion to clarify memorandum ruling is missing from the record; a January 27, 2022 order appointing receiver is "not in the official e-file system"; a March 26, 2022 settlement statement was "falsely labeled"; and a March 31, 2022 receiver's motion for judgment nunc pro tunc "is not in the records of the case."

We conclude Father has failed to present anything here for our review. While we liberally construe pro se pleadings and briefs, we nevertheless hold pro se litigants to the same standards as licensed attorneys and require them to comply with applicable laws and rules of procedure. *Washington v. Bank of New York*, 362 S.W.3d 853, 854 (Tex. App.—Dallas 2012, no pet.). To present an issue to this

Court, a party's brief must contain, among other things, "a concise, nonargumentative statement of the facts of the case, supported by record references, and a clear and concise argument for the contention made with appropriate citations to authorities and the record." *Id*.; TEX. R. APP. P. 38.1(i). Though "we do not require rigid adherence regarding the form of a brief, we examine briefs closely for compliance with rules that govern the content of appellate briefs." *Hammonds v. Dallas Cty.*, No. 05-18-01433-CV, 2020 WL 948383, at *2 (Tex. App.—Dallas Feb. 27, 2020, no pet.) (mem. op.). When a party fails to adequately brief a complaint, it waives the issue on appeal. *Devine v. Dallas Cty.*, 130 S.W.3d 512, 514 (Tex. App.—Dallas 2004, no pet.).

Because Father fails to make a clear argument for his contentions here made with appropriate citation to pertinent authorities, we conclude he has failed to present anything for our review in his fifth issue. *See, e.g.*, *Gioffredi v. Retreat at Riverstone*, No. 01-21-00627-CV, 2022 WL 17981570, at *7 (Tex. App.—Houston [1st Dist.] Dec. 29, 2022, pet. denied) (mem. op.).[2]

---

[2] We note the procedure for supplementing the clerk's record may be found at TEX. R. APP. P. 34.5(c). *See Mayfield v. N. Vill. Green I Homeowner's Ass'n, Inc.*, No. 01-12-00748-CV, 2014 WL 2538554, at *2 (Tex. App.—Houston [1st Dist.] June 5, 2014, pet. denied) (mem. op.) ("On her discovery that the clerk's record did not contain the documents she deemed necessary for this appeal, [the appellant] could have directed the trial court clerk, by letter, to prepare and file a supplemental clerk's record containing the documents.").

In his sixth issue, Father argues the division of property in the final decree of divorce is canceled by another provision in the decree. The decree states, in pertinent part:

> It is ordered and decreed that Petitioner, [Father], is awarded the following as his sole and separate property, and Respondent, [Mother], is divested of all right, title, interest, and claim in and to that property:
>
> P-l. The following real property on the condition precedent he refinance the note payable and mortgage on the martial residence by July l, 2021 subject to the terms of refinancing set forth in this Decree, including but not limited to any escrow funds, prepaid insurance, utility deposits, keys, house plans, home security access and code, garage door opener, warranties and service contracts, and title and closing documents: . . . COMMONLY KNOWN AS [ . . . ] DESOTO DRIVE, DESOTO, TEXAS 75115.

Father argues the first paragraph divesting Mother of all right to the properties listed cancels out the next paragraph conditioning the award of the marital residence to Father. Father cites one authority to support his argument: § 9.007(a) of the family code, which provides that "[a] court may not amend, modify, alter, or change the division of property made or approved in the decree of divorce or annulment[,]" and further states that "[a]n order to enforce the division is limited to an order to assist in the implementation of or to clarify the prior order and may not alter or change the substantive division of property." TEX. FAM. CODE § 9.007(a).

We reject Father's argument. The final decree here clearly conditioned the award of the marital residence on Father's refinancing the property pursuant to the terms of the decree. This conditional award was "the division of property made or

–21–

approved in the decree of divorce or annulment," so it is nonsensical to suggest the decree itself amended or modified that division of property in violation of § 9.007. *See* TEX. FAM. CODE § 9.007(a). Father's sixth issue is overruled.

Father argues in his first issue the trial court erred and violated his Fourth Amendment rights by ordering him to submit to drug and alcohol screening. And in his seventh issue, Father contends the trial court violated his constitutional rights by enjoining his use of alcohol.[3] However, Father did not present these constitutional complaints to the trial court, and he has accordingly failed to preserve these complaints for our review. *See* TEX. R. APP. P. 33.1; *Ricks v. Ricks*, 169 S.W.3d 523, 526 (Tex. App.—Dallas 2005, no pet.) (complaint that divorce decree failed to comply with family code was not preserved for appellate review when complaint was never presented to trial court); *Whitworth v. Whitworth*, 222 S.W.3d 616, 632 n.10 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (when appellant failed to assert constitutional claim before the trial court, she did not preserve the claim for appeal). Father's first and seventh issues are overruled.

In his final issue, Father contends the trial court erred in appointing the receiver for the marital residence, Shelly White, and he raises an assortment of

---

[3] Although the family code does not speak to permanent injunctions, courts routinely incorporate them in final orders in family law cases, and there is no bar to incorporating language of injunction into a divorce decree. *See Peck v. Peck*, 172 S.W.3d 26, 35 (Tex. App.—Dallas 2005, pet. denied). Where the family code discusses injunctive relief, it generally dispenses with the traditional requirements for a permanent injunction. *Id.*; *In re B.J.W.S.*, No. 14-08-01154-CV, 2010 WL 4396291, at *9 (Tex. App.—Houston [14th Dist.] Nov. 4, 2010, no pet.) (mem. op.). "There can be no question that courts routinely grant permanent injunctions consistent with the best interests of the child." *In re B.J.W.S.*, 2010 WL 4396291, at *9.

complaints relating to the receiver. The trial court, in its April 5, 2021 memorandum ruling, ordered Father to "keep the marital residence . . . on the condition that he refinance the home by July 1, 2021 and [Mother] is paid 50% of the net equity." The court ordered that, should Father fail to refinance the home by July 1, 2021, "the house is ordered as sold and the court appoints Shelly White [ ] as the realtor to sell the house at a price that she determines based on the market." If the house was ordered sold, the net proceeds were to be divided fifty-fifty. The final decree signed several months later reiterated these orders. After Father failed to refinance or sell the home pursuant to the court's orders, Mother filed an emergency motion to appoint a receiver, and a hearing on the motion was conducted on September 22, 2021. The emergency motion and any reporter's record of the hearing are not in the record before us. On October 7, 2021, Mother again moved for the appointment of a receiver, stating that Father had failed to refinance the mortgage and was refusing to sell the residence with Shelly White. On October 19, 2021, Father filed a motion in opposition to the appointment of the receiver. Among other things, Father argued no grounds existed for the appointment of a receiver and that the proposed receivership was inequitable. On December 8, 2021, the trial court extended the time for Father to refinance the marital residence until January 21, 2022, and ordered that Father did "not have the authority to unilaterally sell the residence to any third party without the agreement of [Mother]." The court also appointed Shelly White as receiver, effective February 1, 2022, to sell the house at the highest attainable

–23–

price and divide the proceeds pursuant to the final decree of divorce if Father failed to refinance the home within the extended timeframe.

Section 7.001 of the family code "grants a trial court broad authority to divide marital property in a manner it deems just and right upon the dissolution of marriage." *Rusk v. Rusk*, 5 S.W.3d 299, 306 (Tex. App.—Houston [14th Dist.] 1999, pet. denied); TEX. FAM. CODE § 7.001 ("In a decree of divorce or annulment, the court shall order a division of the estate of the parties in a manner that the court deems just and right, having due regard for the rights of each party and any children of the marriage."). The family code further provides that, "[w]hile a marriage is pending and on the motion of a party or on the court's own motion after notice and hearing, the court may render an appropriate order . . . appointing a receiver for the preservation and protection of the property of the parties." *Id*. § 6.502. The trial court may appoint a receiver if it deems the appointment to be necessary and equitable in order to preserve and protect one or both parties. *In re C.F.M.*, 360 S.W.3d 654, 658 (Tex. App.—Dallas 2012, no pet.). Section 6.502 gives the trial court "the broadest form of discretion" when granting section 6.502 orders. *Id*. We review a trial court's order appointing a receiver for an abuse of discretion. *Shultz v. Shultz*, No. 05-18-00876-CV, 2019 WL 2511245, at *2 (Tex. App.—Dallas June 18, 2019, no pet.) (mem. op.).

The record on appeal does not contain a transcript of the hearing concerning the motion to appoint the receiver. "[W]hen we are confronted with an incomplete

–24–

record, we presume the evidence supports the trial court's findings of fact." *Travelers Indem. Co. of Rhode Island v. Starkey*, 157 S.W.3d 899, 905 (Tex. App.—Dallas 2005, pet. denied). Without a complete record, we must overrule Father's challenge to the trial court's appointment of the receiver. *See In re A.W.L.*, No. 05-16-00916-CV, 2018 WL 446421, at *4 (Tex. App.—Dallas Jan. 17, 2018, no pet.) (mem. op.); *see also Blue Window Capital, LLC v. City of Dallas*, No. 05-22-00042-CV, 2022 WL 9765467, at *4 (Tex. App.—Dallas Oct. 17, 2022, no pet.) (mem. op.). Furthermore, Father cites no pertinent authorities to support his other complaints about the receiver; accordingly, we conclude these claims are waived. *See* TEX. R. APP. P. 38.1(i).

## Conclusion

We affirm the judgment of the trial court.

/Ken Molberg/

KEN MOLBERG

210918f.p05                                         JUSTICE



## Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

IN THE INTEREST OF S.I.J.,
S.M.J., S.D.J. II, CHILDREN

No. 05-21-00918-CV

On Appeal from the 255th Judicial
District Court, Dallas County, Texas
Trial Court Cause No. DF-20-07514.
Opinion delivered by Justice
Molberg. Justices Pedersen, III and
Miskel participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

It is **ORDERED** that each party bear its own costs of this appeal.

Judgment entered this 29th day of September, 2023.